I call this the case of the missing facts because the record shows that the district courts neither cited nor considered 15 to 20 critical, undisputed facts that demonstrate that Mr. Beaty's alleged confession to his psychiatrist was involuntary. The State does not disagree that the district court did not consider these facts. The State's position is that the district court was correct in not considering the facts because it would be inconsistent with the district court's findings. But that's our point. If the district court considered the facts, the district court could not have its findings, as the findings are not supported by the facts. One of the most critical facts that the district court ignored was that Dr. O'Connor himself considered the alleged confession and the statements made by Mr. Beaty to be privileged and confidential. He testified under the court's questioning that the question that the conversation was confidential both during the group and it was confidential after the group was beginning to disperse. But isn't the test coercion? Isn't that what we end up having to look at? I agree with you, Your Honor. The district court addressed two issues. One was, did Mr. Beaty reasonably understand his statements were covered by the promise? On that one, the district court seemed to agree that Mr. Beaty could have concluded that his statements that took place as the group was dispersing was covered by the promise of confidentiality. The district court seemed to be backing off from that later on in its opinion. That's what I wanted to ask you about, actually. It was, I think, around SER 395 where the court is quoting from the agreement and then says it's possible to interpret it as covering post-session statements to Dr. O'Connor. Then a few pages later, the court seems to say that in looking at the surrounding circumstances, it would not have been reasonable to believe that these blurted out statements were covered. So what is, how do we interpret those findings to the extent they are findings? I've had a hard time. I've reread the opinion over and over again. And my reading of it is the district court first addresses the issue of the reasonableness of Mr. Beaty's confession, whether or not it was covered by the promise. And during that discussion, she then talks about coercion, and she ends the discussion with the issue of coercion. The second section then begins with coercion, and she concludes that the promise, although it may have been covered, it was not a coercive promise. So I'm not too sure on it. But to the extent that the district court is stating that the promise of confidentiality did not extend, because she does address the scope of the promise during that section 2, to the extent that she's saying that the scope did not extend to the statements Mr. Beaty made to Dr. O'Connor following the group therapy session, that finding is clearly erroneous based upon several significant facts, including the one I just mentioned, that Dr. O'Connor himself felt that the conversation was confidential. That is coupled with Dr. Potts's testimony. Dr. Potts was the head of the Durango psychiatric unit where Mr. Beaty was housed, who also said the conversation was confidential. It's also bolstered by Dr. Garcia's testimony. Dr. Garcia was the head of all the psychiatric services in Maricopa County who said it was confidential. And every inmate who addressed this issue said the conversation with the psychiatrist is confidential. Well, let's – some of those relate to confidentiality during the session. And we have this twist here. The real question is how far the session extends. And do you agree that the standard, at least for part of what we have to decide, is whether he reasonably – you know, what is the scope of the promise and did he reasonably rely on it? I do agree that's true. Okay. So let's just start with that, because I want to kind of divide things up. In terms of what is the scope of the promise, the judge seemed to make a global finding that combined that and the second factor, which is he could have reasonably believed that his promise extended to the conversation with Dr. O'Connor. So would you agree that she seems to combine the extent of the promise and his reasonable reliance? I do think she does, Your Honor. And I think at that point she's saying from Mr. Beatty's perspective, which is the correct legal standard, the promise extended to his statements. And it seemed later on she was saying factually that may be in question. But from Mr. Beatty's perspective, which is what precisely the Court remanded on, the district court seems to be saying that, yes, the promise did cover his statements. But then – so if that's the finding and it does cover the first part, you then have the third part, and that is whether his will was overcome as a result of having this agreement or promise. So my question then is, the finding which you label as contradictory, which then seems to suggest that this chat is outside of the promise, is that a conversation predicated on the third factor? I mean, or is that a finding predicated on the third factor? Or is that just a separate, independent, loose finding that we have in the record that doesn't attach itself to a factor? I'm not sure, Your Honor. To me, there are two issues. One is, did the promise extend? And two, was it a coercive promise even if it did extend? And on that one, it's clear the district court was ruling against us that there was no coercion from the promise and his will was not overborne. And I'm not sure if I'm answering Your Honor's question. Right. Well, so on that one, I guess the question is, from whose perspective or what's the legal benchmark for that third element? Because if you are correct that the district court's finding that there was subjectively a reasonableness in his perception that it was within this penumbra of confidentiality, it still has to be – his will has to be overcome. So is that – will overcome a general reasonable person standard? Or what is the benchmark? I do believe it's a reasonable person standard. And as so, it is a legal issue and to be reviewed de novo. Even if it were a factual issue, even if the court would determine it's a factual issue, there are probably ten facts that are critical to that issue which are not cited by the district court at all. The number one fact being that Dr. O'Connor admitted at the hearing that he was having a conversation with Mr. Beatty about Kristi Fornoff. And from that conversation, he learned that Kristi – that Mr. Beatty viewed Kristi Fornoff as young, bouncy, cute little girl. He testified that that conversation took place in the context of the group. That means that the district court's finding on page 26 that Mr. – that Dr. O'Connor said nothing that would prompt Mr. Beatty to make a – Except that the – this conversation took place – I think Dr. O'Connor's testimony is pretty clear about this, not only now but in 1985, that this took place five to ten minutes after the end of the group. That your client waited a while while he talked to somebody else and things were breaking up and that he just blurted this out, that it came out of the blue, that it shocked Dr. O'Connor, that he didn't elicit it in any way. So why aren't those findings supported by the record? They are not supported by the record for a number of reasons. One is the district court stated that Mr. Beatty waited five or ten minutes, and that is somewhat confusing because he didn't wait five or ten minutes and then decide to go talk to Dr. O'Connor. The evidence is undisputed. He walked right up to Dr. O'Connor. It took him five to ten minutes before he could say anything to him. But at that time, it's clear that he was still feeling compelled to discuss what took place during the group where Dr. O'Connor himself – Where does the word compelled come from? He wanted to talk about it, but that's a very loaded word. What evidence shows that he was compelled rather than that he just chose to do it? Several points. One is that Dr. O'Connor testified that when Mr. Beatty came up to him, he wanted to discuss this because the group discussion awoke something in Mr. Beatty that he had a need to resolve that day, which is consistent with all the cases that address a coercive promise. The district court relied upon Mr. Beatty's cross-examination testimony that, no, nobody forced me to go up. I could have gone back, but that is never the issue in a coercive promise case. For example, in the Walton case, the defendant called the police officer and they sat on a park bench. And during that period of time, the police officer said, you're always free to go. But he did make a promise to the defendant that anything you say will be off the cuff and protected. So in that – in coercive promise cases, they're not the same as physical compulsion, which I submit is what the district court is focusing on when you look at, was the person free to walk away if they wanted to. In fact, the – Now, my question, though, went to your argument that there was something that Dr. O'Connor did or said that pulled this information out, rather than that he just wanted to talk about it, which is quite different. Yes. Dr. O'Connor questioned Mr. Beatty himself during the group. Dr. O'Connor encouraged the group to attack Mr. Beatty's character in committing what he was alleged to have committed. Dr. O'Connor had a continuing conversation with Mr. Beatty about Mr. Beatty's alleged interest in young women. In addition, Dr. – we had expert testimony showing that Mr. Beatty has an organic brain injury, which would make him more – and that's the reasonable standard person in Mr. Beatty's shoes – which would make him more susceptible to the need to turn to the group leader for comfort. Dr. O'Connor had first initiated his communications and relationship with Mr. Beatty by intervening when people felt – or when he was distraught about how people were viewing him. He testified that he expected Mr. Beatty to turn to him in the future if he was distraught about the way people were viewing him. They just had a group session in which Mr. Beatty is being attacked for having committed this act. Dr. O'Connor participated in that group discussion. Dr. O'Connor encouraged that group discussion. Dr. O'Connor testified that Mr. Beatty had a need to resolve that day what was discussed. And what was discussed between Dr. O'Connor and Mr. Beatty was not what you typically think of as a voluntary confession of, I feel really bad about what happened. I want to tell you I did this. Instead, Mr. Beatty was making statements that responded to the group attack. So it's all in conjunction with one another. And during the course of that defending himself of the therapeutic attack, he makes extra statements from which Dr. O'Connor from a gestalt assumes is a confession. So those are the factors of compulsion on Mr. Beatty. In addition to that, Your Honor, I pointed out that Dr. Potts, the head of the Durango unit, testified that he met with Mr. Beatty when Mr. Beatty was first transferred in. And it is his role to always tell high-profile defendants not to talk about their crimes or the charges in the group therapy. Wait until afterward and speak to the psychiatrist directly. And that's what Mr. Beatty was doing. He followed the prescriptions of Dr. Potts. Let me just go back on this issue of compulsion. To me, that's puzzling in the context of this case. So let's say that we had just a normal group session, and everything went just like it did here. But at the end of the session, while everybody was in the room and in the circle, Mr. Beatty said exactly what he later told the doctor. In that context, would we even be asking or analyzing the issue of compulsion? I suppose we would, Your Honor, because he's promised confidentiality. He's relying upon that promise. The question is, is the promise coercive? And, of course, there are a number of cases we've cited where there's been no other evidence of psychiatric pressure at all, just the promise itself, such as the Third Circuit says sometimes the promise itself is the most important factor. Well, that's what I'm wondering in the sense of if you have a we have a promise case here where there's no overt coercion by any State actor. I mean, in that case, the doctor didn't ask him a question. The other inmates are not State actors. They're just co-patients. So I guess I'm wondering if this case is unlike any of the other cases that we've looked at. I think it's a stronger case. Those other cases in which the promise itself was deemed coercive did not involve any psychiatric care. It was a police officer. Now, we cited the Jacobs case in our reply brief, which refers to a police officer talking to an informant. And in both of those instances, those circuit courts determined that the promise itself was coercive because of the history of the friendship between them. In this case, we have a psychiatrist who has propensed narcotics, which Dr. Potts states creates a powerful relationship of dependence. He has repeatedly intervened to protect Mr. Beatty when Mr. Beatty has been distraught about the way people view him, whether it was his family or prison guards or now the group. So all those factors compel him all the more to speak. And that's what Dr. O'Connor stated. It's what Mr. Beatty stated, that they had the compulsion from the group attack on him, which Dr. O'Connor, it's undisputed, participated in. And I hope I answered your question. Thank you. I also want to point out that Dr. O'Connor kept the confidence for six months, which demonstrates that he understood it was confidential. In fact, at the hearing, he testified unabashedly that he deemed it confidential, that he was not going to reveal the confidence because he was confident that Mr. Beatty would be convicted. And when Mr. Beatty's first trial resulted in a hung jury, he stated, and I think I'm quoting directly, wow, I need to do something. At which time he testified that he chose to go to the prosecutor and reveal what was, as far as he was concerned, a confidential communication. He tried, as Your Honors probably have seen, to rely upon Tarasoff, but that has been rejected. But in trying to rely upon Tarasoff, it shows what his frame of mind was. He was trying to say it's confidential, but I need to reveal it. In reality, he needed to reveal it, and he states this, because he wanted Mr. Beatty convicted. In that instance, he went from being a psychiatrist to a prosecutor using words that were meant as therapeutic. Does any of that matter if the other standard isn't met? In other words, I'm not sure what the relevance of his state of mind is, whether it's protecting the public or not. I mean, Tarasoff relates to I'm protecting the public and future potential victims, and that's why I have to come forward. But if he's being noble or not noble, what effect should that have on our analysis? One of the points that the disquote made was that it was not Dr. O'Connor's intent to obtain a confession. But the cases we have cited, Estelle v. Smith, Robinson, D.F., all stand for the proposition that it doesn't matter what the person's intent was at the time. What matters is when that statement switches from something therapeutic to an inculpatory statement being used by the prosecution. That's when the Fifth Amendment comes into play. So when Dr. O'Connor is asking Mr. Beatty about Christy Fornoff, if it's therapeutic, that may not be a violation by itself. It's when he then changes his role to become not psychiatrist, not examiner of someone's dangerousness or of their mental state, but where they become a, where he's going to testify as a witness for the prosecution purposefully. That's when the Fifth Amendment is implicated. And that's when the confession becomes involuntary. So the focus isn't on the intent, although the intent is important, because if they intended to get the confession, obviously we know it's a statement that reasonably could have been understood by the government to elicit a confession. And that's why I bring that up. Those three cases make very clear that once you switch your roles, you violate the Fifth Amendment. Counsel, you're down to about two minutes. You can reserve or use. Yes, I'll reserve it. Thank you. Very good. You may reserve. We'll hear from the State. May it please the Court. I'm John Todd. I represent the Respondents in this matter of the State of Arizona. The Court is absolutely correct that the focus in a voluntary issue is the whether there was State compulsion and whether that compulsion overbore the defendant's will. Here the district court was correct, and the record supports the fact that there was no State compulsion that caused Mr. Beatty to confess. To what extent is that an issue of fact, and to what extent is that an issue of law? I mean, we sent it back for an evidentiary hearing, so clearly there's a factual component. But where do we stop with fact-finding and start with the application of law? Your Honor, I think that it is a factual question whether or not there was State compulsions, there was coercion. I think that's clearly a factual question. I think the cases that I cited say that. So our standard of review is clearly erroneous? Clearly erroneous. As the Seventh Circuit said, that the district court's findings have to be so erroneous that it strikes this Court in the face with the force of a fish that is five weeks old and unrefrigerated. And I submit the facts here don't even come close to that. Well, the difficulty I have is fitting this case in with some of the others that we have, because there you have direct questioning. You know, most of them are really in distinction in terms of the circumstances. Do you view the promise here, whatever its scope may be, as being an element of coercion? I do not. I think that the at most this to the whatever confidentiality was promised, to whatever extent, that was nothing but but for. In other words, which is not the causation test for voluntariness, you know, perhaps he wouldn't have talked to Dr. O'Connor but for the fact that he thought his conversation might be confidential. But that wasn't what compelled him to talk to Dr. O'Connor. It's clear from this record, from his very own testimony, that after the group meeting where the other inmates dumped on him, accused him of being cold-blooded, and according to Don Guyer's testimony, they got on him, on Guyer for calling him cold-blooded, that Beatty, according to his own testimony, admitted that he decided, he decided to go and talk to Dr. O'Connor about what had occurred. The record shows that there were other people waiting to talk to him. He testified that nobody forced him to go up and approach Dr. O'Connor. He admitted that he could have gone to the, his own pod, to the cells. He said he, as Dr. O'Connor was talking to another lady, he put his knee on a chair to keep Dr. O'Connor from leaving, showing his own volition. He said he was. I guess I'm just wondering if that's the test, so let's just back it up a little. Certainly. And it's along the lines that I asked Mr. Beatty's counsel. Let's say they're in the group and the same, I guess we'll call it badgering or at least dumping on as a result of the nature of the crime and the circumstances of him. The same thing happens and he wants to say it's not that bad or it didn't happen that way and he blurts out in the group exactly what he told Dr. O'Connor afterwards. In your view, would he be protected by the promise that nothing said in the group would go beyond the group? Again, the focus is on what compels that statement. If what compelled the statement was his belief that he could say this and nobody would say anything beyond the group, then sure. But that isn't under the example you use in what happened here. That was not. I want to clarify that. But how do you know that? Right. Because if, you know, if we're having a conversation and there's all these people in the courtroom, but then we can go back and say, look, we're going to have a confidential conversation. So then I tell you something because we're having a conference. It's the knowledge of the bounds of our contract as to why we're having a confidential conversation. So if we go under your analysis, absent affirmative State action, the confidentiality agreement is kind of not worth the paper it's printed on, is it? I'm not sure I understand the Court's question, but certainly you have to have State action. If you don't have State action, then it's not worth anything. Well, let me ask it a different way, if I may. Dr. O'Connor is clearly an employee of the State for this purpose. And let's say, to follow up on Judge McEwen's example, that the whole conversation takes place within the confines of the group session as to which the written agreement saying what is said in the group stays in the group. And someone confesses, whether it's Mr. Beatty or someone else, and says, well, you know, because this is a confidential group, I feel free to unburden myself for therapeutic purposes, and I'm going to tell you that I committed this crime and I didn't really mean to do it and so forth. Is it your position that that is admissible at trial when the State-employed psychiatrist testifies because the person had a choice whether to say it, or is your position that that is prompted by the confidentiality and therefore not admissible? If it's within the group, I know that's not our situation. Right. I think it depends on the factual determination as to what caused him to say it. If and ‑‑ Why does that matter? If it would not have been said but for the fact that this was promised to be confidential? Because the Supreme Court has told us that but for is not the test for voluntariness. If it's simply but for, that is not compulsion. You have to ‑‑ the State has to extract the confession. Well, why isn't it doing that in my example by having people sign a confidentiality agreement, which deceives them into thinking that if they just want to talk freely, they can and it won't go outside the group? If Dr. O'Connor had gone to Mr. Bailey, Batey, and said, you tell me that you did it and I won't tell anybody, that would be ‑‑ Why is that any different than the written agreement that says what is said in essence, what's said in the group stays in the group? Why isn't that even more of a promise than something said orally? The promise in the written agreement was whatever stayed in group wouldn't ‑‑ was supposed to ‑‑ the group members were not supposed to discuss it outside of the group. So that ‑‑ if that promise was what caused Mr. Batey to confess, then that would be, if that was state action, that would be in violation. And that's what his testimony was here, although it didn't occur in the group. His testimony, which the district court did not credit, and it was a ‑‑ and this was that he made a decision after the group to go and talk to Dr. O'Connor because of what occurred to the group. He denied in his testimony at the hearing that he ever made a confession. There is no showing in this record that his will was ever overborne by anything. I mean, you have to have ‑‑ you have to have the compulsion and you have to have it to such a degree that it overbores the person's will. What was Judge Bolton's finding with respect to compulsion to make the statement? I believe her finding was that it was because of what occurred by these other inmates in the group setting, that this attacking Mr. Batey because of the circumstances of his crime. We said in our opinion in which this case was remanded to the district court, we said the critical question before us is whether Batey reasonably believed that his statements were protected by the state's confidentiality agreement. The factual record is not adequately developed for us to assess this question with any confidence, and then we remanded. On that precise question, it seems to me that the district court said that he could have a reasonable belief that, in fact, his statements would be protected by the confidentiality agreement. So it seems to me that with respect to what I thought the scope of the remand was, the district court answered that it was because of what occurred by these other inmates in the group setting, that this attacking Mr. Batey. Maybe, I mean, that's so what do we do then with that finding? Well, she, I think she found that it was not, that was not what compelled him to testify. I want to go back to something that I asked opposing counsel on, and I think relates to Judge McEwen's most recent question, and that is at SER 395, after quoting the contract, the judge says, in her opinion, petitioner could reasonably have concluded that the promise of confidentiality applied to what happened within the group, as well as his conversation with Dr. O'Connor outside the group immediately following the session. But then three pages later, after discussing the circumstances, she says, in sum, the attendant circumstances of petitioner's confession discredit the reasonableness of his assertion that the contract was an unqualified promise of complete confidentiality. I cannot reconcile those two findings, except with the possible explanation that the first piece of it looks at an abstract question, how could a person understand this contract, and the second half is, okay, notwithstanding that, that's not what the question is, how do those things fit together? My understanding is what you said, that generally speaking, the, it would not be unreasonable to have, even though there's other people out there waiting to talk to Dr. O'Connor, that his statements would be, that he would perceive that his statements were covered. However, in light of what he claimed he said, that he didn't want them covered. And his position was that he wanted Dr. O'Connor to go back to the group and say, don't, you know, stop this behavior and so forth. If we were to determine that we can't figure it out because, in effect, you have conflicting factual findings, and it wouldn't be our role to resolve those, what would be the remedy, in your view? Well, Your Honor, first of all, simply because there's conflicting doesn't, you need to look at the entire record, and you have to accept the district court's findings unless you have a firm conviction that they are clearly erroneous. This case has been in the courts 23 years. The district court held a three-day evidentiary hearing. It made, it had the opportunity to look at Mr. Beatty. It had the opportunity to look at these other witnesses. It made certain factual findings. You owe the district court, you owe the State of Arizona deference to apply those factual findings unless you find them clearly erroneous. Well, but that doesn't answer my question. My question, more precisely, is this. We asked the district court to determine a specific question with respect to the reasonableness of Mr. Beatty's belief. The district court starts out the decision in effect restating that question and then goes on to say, you know, that it would be reasonable. If, although we have to credit all findings absent clear error, if a crucial finding, which I think the scope of the agreement and his subjective belief is a crucial finding, if that finding appears to be at odds with summary or other findings, I guess my precise question is, even under the clear error standard, which I appreciate is our very deferential view, what do we do? Well, Your Honor, I think that the district court, after hearing all the evidence, decided that the extent of Mr. Beatty's reasonable belief as to his conversation being confidential with Dr. O'Connor was not the critical element in resolving the issue on which he was referring to. And that was whether or not he had remanded the case and that was whether or not his statements were voluntary. As the court originally, the court thought that Dr. O'Connor was the one that chose Mr. Beatty. I think the record shows that it was a team decision, it wasn't Dr. O'Connor, that I believe the original, this court thought originally that had Dr. Beatty not been transferred, he would have been transferred back to the main jail if he had refused the group. The record shows that's incorrect, that this was a voluntary group. The – I think there's a lot more information that was developed during the course of the evidentiary hearing that this court didn't have the benefit of at the time. And I don't know if I've answered your question. I – this case has been going on 23 years. Anything further, counsel? Not unless the court has anything. No further questions. Mr. Chartland, you have some reserved time. I have common ground with Mr. Todd on one issue. They didn't even brief the first issue of the scope of the contract, apparently assuming that the district court ruled that the contract did apply. I have common ground with him on that point. What Mr. Todd states or what the state is claiming is the issue of compulsion came down to the district court on what took place in that group and how Dr. O'Connor had nothing to do with it. But that is clearly erroneous because we have undisputed facts that Dr. O'Connor played a role in the group, asked Mr. Beatty about Christy Fornoff, and he agreed that he encouraged the group attack on Mr. Beatty with respect to his character. So that's why the second issue of compulsion is clearly erroneous. The issue of compulsion itself, I agree, is a legal standard. Well, on that point, assuming for the sake of argument that it wasn't five or ten minutes afterward, but the next day, he happens to run into him in the prison yard, and he makes the same presentation, what then? On that question, I argue it is still compulsion, and I would cite to the record that Dr. O'Connor in the group permeates everything, is that what you're saying? In part. And first I'd cite Dr. Garcia's testimony that sometimes in therapy you have these discussions that are very personal going on, and the person may not respond until the next day or so when they see that psychiatrist and they've thought about the issue. In addition, Your Honor, in this case, and I really want to make this point, the group session had ended. The undisputed facts are group members were dispersing, but two group members continued to discuss group business in the group room in the very spot where the group discussion took place. And the contract does not say there's a quota of how many group members have to be there, or that there's a time frame when the confidentiality provision suddenly stops. Can I just ask one last question? Is your compulsion argument predicated on anything other than the agreement and the conduct of Dr. O'Connor that you just referenced? Yes, and also the fact that he has an organic brain injury that would make him more susceptible to seeking the relief that he got from Dr. O'Connor, and that Dr. O'Connor nurtured this relationship where he wanted Mr. Beatty to turn to him throughout his incarceration, including the time when Dr. O'Connor was in prison. Dr. O'Connor was at the main jail, and Mr. Beatty was at Durango and just doing NPOD therapy sessions, because the undisputed testimony, even from the State's only witness, is Dr. O'Connor continued to sit into those groups. And the only other thing I'd like to add, if I quickly could, is that Dr. O'Connor had set the precedent by having one-on-one communications with Mr. Beatty, by asking Mr. Beatty to sign, to write out these essays and pass them in. The group members would never know about them, so Mr. Beatty knows that one-on-one communications take place with Dr. O'Connor and him without group members knowing, and he also went to Mr. Beatty outside the group to discuss these matters, as he agrees. All right, thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn. With respect to the students, the panel is going to have a conference for a little while, and as soon as we're done, we'll come out and have an informal conference with you with respect to the Court and its work. Thank you.
judges: O'scannlain, Graber, McKoewn